In the Matter of the Estate of MARY J. MARTIN, Deceased.

Surrogate's Court, New York County, December 23, 1937.

*Rogers & Whitaker* [*John F. Condon, Jr.*, of counsel], for the executors of deceased trustees.

*Seth B. Robinson*, for the objectant.

*Thomas F. Cohalan*, special guardian of infants.

DELEHANTY, S. Before commenting on the substantial question which is presented by this accounting and the objections thereto, the court can summarily dispose of practically all of the objections, leaving for extended consideration only objections second and third.

Objection first is overruled. It relates only to matter of form and not of substance. Objection fourth was marked withdrawn during the hearing because the taxes there referred to were in fact paid by the life tenant. Objection fifth was marked withdrawn during the hearing, it having been shown that the transaction there criticized had been closed out by a collection of the money involved. Objection sixth is overruled. Objection seventh will be disposed of by making an appropriate reservation in the decree to be entered, leaving open any question that might need determination when a distribution must be made. Objection eighth was disposed of prior to the hearing by the appointment of the successor trustees, and needs no further ruling. Objection ninth is disposed of by the ruling on objection sixth. Objection tenth is overruled. The amount proposed to be charged to principal is not in excess of a fair charge for an accounting covering so lengthy a period as is here' involved for a sum so substantial as is the trust principal here. The petition seeks allowance of a fee of $1,000 for legal services. The court has taken proof respecting the services and considers the amount requested as reasonable, especially in view of the fact that half of the sum will be charged to income account. The allowance made excludes the allowance of any bill of costs. Only necessary disbursements in the proceeding will be taxed.

There remain for consideration objections second and third. These relate to the handling by the trustees of a mortgage of $12,000 which was originally received by them in 1902 from the executors. No question is raised respecting the original investment. The mortgage was a lien upon premises at Sea Gate, Coney Island, consisting of an improved parcel and adjacent unimproved parcels. Presently the trustees have on hand the real property which was the security for the original mortgage debt. In the thirty-five years since the trustees received the mortgage there was a foreclosure of the original mortgage, a rehabilitation of the property, a resale of it on terms hereafter stated, and a second acquisition of it in lieu of the foreclosure of a mortgage taken back on the resale. While the trustees held the land after the foreclosure of the original mortgage, they incurred a very substantial expense in restoring the property after a severe storm had washed away much of the land and had undermined the foundations of the house. Consideration must be given (a) to the proper allocation of the expenses in rela-

tion to the property which are scheduled on page 8 of the account, (b) to the apportionment of the proceeds of the resale of the premises made in 1919 by the trustees after they had acquired the premises in foreclosure in 1918, and (c) to the ratio now to be fixed of income and capital participation in the proceeds of the resale and also in the real property which is now on hand.

Taking up the expenses scheduled on page 8 of the account, the first is an item of $3,591.31 listed as payment to the referee in the foreclosure proceeding. These payments are capital charges subject to the rule laid down in *Matter of Chapal* (269 N. Y. 464). The next item is one of $250 representing an amount paid to Sea Gate Association for dues. This payment was made by the trustees when they sold the improved portion of the premises acquired by them in foreclosure. In the contract for the sale of this parcel the trustees agreed to pay one-half of the accrued and unpaid assessments thereon due to the Sea Gate Association, but in no event more than half of a total of $500. The $250 payment of February 15, 1919, is exactly half of this $500 limit set in the contract for resale of the improved parcel. It was a principal outlay necessary in the making of the sale, and is subject to the *Chapal* rule. The next item is one of $91.87 paid to the receiver of taxes for the second half tax accrued in 1918 on this same parcel. It must also be treated as a capital charge subject to the *Chapal* rule. The next item is a payment for revenue stamps on the deed. This is an expense of the sale, is a capital charge, and is to be dealt with under the *Chapal* rule. The next item is the brokerage commission of $262.50 paid on the sale of the improved parcel. This is a capital charge and is to be dealt with under the *Chapal* rule. The next item is one of $28.60 for an insurance premium; $27.80 of this amount was refunded when the purchaser took over the insurance on the sale. The net difference of eighty cents is a capital charge and is to be dealt with under the *Chapal* rule. The next two items are $1,606.50 and $720, respectively, paid for rehabilitating the foreclosed property after a storm had undermined the house foundations and had excavated a very substantial amount of soil from the lawn. It is obvious that premises in such condition could be sold, if at all, only at a sacrifice. It was entirely legitimate for the trustees to refill the lots, restore the foundations, replace the house on them and make such internal repairs to the building as the threatened collapse had caused. Such repairs are not in any sense current repairs chargeable to income. They are extraordinary capital costs made necessary by the injury to the building and the land from the storm. Each and all of the expenditures are held by the court to have been justifiable capital expenditures to be dealt with under

the rule in *Matter of Chapal.* The next item is one of $737.13 paid on November 24, 1919, to the Sea Gate Association as a balance of unpaid assessments. It has already been noted that the original sale by the trustees was of the improved parcel only. The trustees at that time retained the vacant lots which were part of the realty covered by the foreclosed mortgage. The dues paid on February 15, 1919, related only to the improved parcel. The item of $737.13 accrued in relation to the unimproved lots. Since the property was located at Sea Gate and was subject to the rules of the Sea Gate Association the payment of such charges was necessary in order to effectuate a sale. While the assessments may not have constituted a lien in a legal sense they were a burden on the property in a practical sense and the removal of that burden was essential to a sale. Accordingly this payment constitutes a capital outlay to be dealt with under the *Chapal* rule. The final item of outlay is one of $11.50 for revenue stamps on the second deed given to the purchaser of the vacant lots. This is a capital charge to be dealt with under the *Chapal* rule. The trustees show that they collected from the purchaser the unearned insurance premiums and that they also obtained some cash for wreckage. The account of the trustees shows a net capital invested in the property of $19,267.86. Of this sum $12,000 represents the original mortgage principal and $7,267.86 represents proper net advances from capital account for the purpose of the salvage of the mortgage investment.

The decisions in *Matter of Chapal (supra)* and *Matter of Otis* (276 N. Y. 101) established certain rules to be followed in allocating moneys received out of property sold in a salvage operation. Under these authorities the advances out of capital account for the purpose of salvage are to be kept separate from the original principal account. Here, these advances aggregate net, $7,267.86. Such advances are entitled to preferential treatment and, to the extent cash is available, are recoverable in full before any participation in cash sale proceeds may be allowed to the income beneficiary.

Proceeding from this premise it is apparent that the trustees have erroneously dealt with the money received by them on the resales during the year 1919. Between January 27, 1919, when they got the down payment on the first parcel resold, and December 24, 1919, when they completed the sale of the unimproved lots, they received a total of $4,150 in cash. All of that money should have gone immediately into capital account and should have been used to repay the new advances from capital account. The original total of such advances ($7,267.86) should have been reduced to a net of $3,117.86. The allocation between principal and income shown on page 9 of the account under which the trustees

professed to have allocated to income part of a so-called " profit " is wholly erroneous and the account must be restated so as to put all the cash received on the resales into capital account. Detailed treatment of these funds in their relation to the respective sales transactions will be found later in this opinion.

It was stated by the Court of Appeals that a general rule for all salvage situations cannot be attained at a bound and that no rule can be final for all cases. Here there is presented by the account itself a handling of the transaction by the trustees which it is easy to say was unsound and so must be corrected. It is not so easy to state for the trustees the program which they should have followed. It happens in the particular instance now under consideration that the court is dealing with at least three separate parcels of land, one only of which was improved — all acquired in the foreclosure of the original mortgage investment. It happens here also that the same person purchased all of the parcels so acquired. His purchases were made at different times and the court must consider the rule to be applied as if the purchase had been made by different persons. In laying down herein the rule to be followed by the accounting parties in restating the account the court is endeavoring to shape a rule by considerations of business policy and to arrive at a basis which is fair, convenient and practical.

The first question which is presented is whether or not the sale in February, 1919, of the improved parcel constitutes a closed transaction or whether such sale and the business transactions connected therewith must all be held in suspense until the final sale of the last item of real estate acquired in the foreclosure. The court is of the view that practical considerations require the holding that the transaction is a closed transaction whenever any part of the foreclosed property is resold. Another storm might, for instance, destroy the entire value of the unimproved parcels and so make further salvage of this particular property impossible after the improved parcel had been sold. In such circumstances after-occurring events would have terminated the salvage process. So, too, it can be supposed that a mortgage is foreclosed which covers a tract of suburban property either held in acreage or already laid out in subdivisions for development and sale as lots. It would be wholly impractical in the latter situation to keep all transactions in suspense until the last of say 1,000 lots had been sold off. So, too, it would be impractical to keep in suspense transactions of sale of part of the property to A until other portions had been sold to B and still others to C and then to work out an apportionment which might revolve in part at least around the relative

responsibilities of A, B and C as makers of mortgage bonds. Every practical consideration of business policy accords with the idea that the completed sale of any portion of the foreclosed realty is to be dealt with as a unit transaction to which will be applied the rules of apportionment set down in the *Chapal* and *Otis* cases.

The first problem presented by the determination so to treat the separate sales of the foreclosed realty is the allocation to the various parcels sold of the respective values thereof. Such allocation of values must be made in order that it may be determined how much of the original mortgage investment is deemed to be tied up in each parcel. That determination is the first step in any apportionment which thereafter may be necessary. In this case the sales occurred within a few months of each other and within a year after the foreclosure. Lacking any other proof of value the court will assign to the respective parcels the values at which, in fact, they were sold. On this basis there is assigned to the improved parcel a value of $10,500 and to the unimproved parcels collectively a value of $11,250. On this basis the amount of original mortgage debt deemed locked up in the improved parcel is $\frac{10,500}{21,750}$ times $12,000 or $5,793.10. The amount deemed locked up in the unimproved parcels collectively is $\frac{11,250}{21,750}$ times $12,000, or $6,206.90. It should be noted that the allocation made by the court is made out of necessity only. The correct rule to be followed by fiduciaries who take property in foreclosure which is susceptible of resale in parcels is to have the property appraised at the time of acquisition in foreclosure. Thereby data will be available upon which future apportionments may be made. Each parcel so appraised will be subject to the currently accruing taxes upon it, and an account should be kept of taxes and other items in their relation to the separate parcels so separately appraised. The appraisals so made are to be the basis for computing the amount of original mortgage capital tied up in each separate parcel, and thus the basis for computing the interest credit on resale of the parcel. As was said in the *Otis* case, it is impractical to have a continuous appraisal. The only date as of which appraisal may be made with justice to all interests is the date of acquisition in the foreclosure.

The actual sale of the improved parcel was made by contract entered into January, 1919, and closed on February 14, 1919. Following the *Chapal* and *Otis* rule, the court directs that the interest credit which governs the computation of the share apportioned to income in the sales proceeds is to be based upon a principal sum of $5,793.10. The interest credit is to be computed at

the mortgage rate of six per cent from the date of last interest payment to February 14, 1919, as of which date the sale of the improved parcel was completed. The account (p. 27) shows that interest was paid up to December 12, 1916. Two years and sixty-four days elapsed up to the date of sale. On a principal sum of $5,793.10 interest would accrue of $756.96 during that period. As of February 14, 1919, therefore, the improved parcel held by the trustees represented $5,793.10 of original mortgage principal and $756.96 of interest thereon.

The original principal sum and the original interest thereon are not the only factors requiring consideration at the date of resale and in the apportionments resulting from the resale. It is necessary to determine how much of new capital had gone into the salvage operation for account of the improved parcel. Determination of that sum is simple enough except in respect of the first item of expense which is reported on page 8 of the account. Since this item is not segregated into foreclosure expenses and taxes, the court once more is constrained to adopt a rule of thumb. The general foreclosure costs ought to be allocated in the proportions assigned by appraising the respective parcels. Not so the unpaid taxes. But in the absence of proof of what they are the court will apply the same fraction to the first item on page 8 as was applied to the original mortgage principal. Of the foreclosure costs and taxes paid to the referee, therefore, there will be allocated to the improved parcel an amount ascertained by taking $\frac{10,500}{21,750}$ times $3,590.74, or $1,733.74. In respect of the improved parcel, all of the items listed on page 8 of the account under dates February 15, February 18 and February 19, 1919, are allocated to the improved parcel as capital advances occasioned by its carrying and rehabilitation. The credit items appearing under dates February 15 and February 18, 1919, are also credited wholly to the advances for the improved parcel. Thus there is arrived at a total of new advances out of capital (including the expense of the resale of the improved parcel) for account of the improved parcel amounting to $3,941.66. Under the *Chapal* and *Otis* rule, therefore, principal account was entitled to have out of the proceeds of sale complete reimbursement for the new advances of $3,941.66, and then whatever was left was pledged to apportionment in the ratios established by an original principal investment of $5,793.10 and an assumed interest credit of $756.96.

The actual terms of the sale bring into this accounting a situation not present in either the *Chapal* or *Otis* cases. The actual sales

proceeds were \$3,000 in cash and \$7,500 in a purchase-money mortgage. In the *Chapal* case it was assumed and in the *Otis* case it was found that sufficient cash was received on the resale to reimburse principal account for the new capital outlays. Here that is impossible. The entire cash received on resale should, of course, go into principal account. That leaves unrefunded to principal account \$941.66 of the new advances, and the question is at once presented what is to be done about this unrefunded advance. Again applying those business principles which the trial courts are admonished in the *Otis* opinion are to shape the rules eventually to be applied, there must be allocated to principal account the thing which is next best to cash. In this case all that is so available is a prior participation in the purchase-money mortgage. The court holds that there should be allocated to principal account a prior participation to the extent of \$941.66 in the \$7,500 purchase-money mortgage received on the sale of the improved parcel. That this is the proper course is evident when it is seen that the trustees might have borrowed money on the credit of the parcel and sold it subject to a first mortgage, which would be sufficient to pay the carrying charges and the rehabilitation costs. In such event a resale would have had to be subject to the prior claim of the first mortgage. To give that same prior claim to the principal account is sound.

It follows from the foregoing that the balance in the purchase-money mortgage apportionable between principal and income account is only \$6,558.34, and that such whole share in the purchase-money mortgage is junior and subordinate to the prior share assigned to principal account. For such apportionment, in the principal account is to be found \$5,793.10, and in the income account is to be found \$756.96. The junior interest in this purchase-money mortgage, therefore, stands as security for a total of \$6,550.06. The principal interest in this junior share of the purchase-money mortgage, therefore, is found by applying a fraction of $\frac{5,793.10}{6,550.06}$ to the total of the junior share in the purchase-money mortgage, \$6,558.34. This results in finding a principal participation in the junior share of the purchase-money mortgage amounting to \$5,800.41. The interest participation in the junior share of the purchase-money mortgage is ascertained by applying a fraction of $\frac{756.96}{6,550.06}$ to the junior share in the purchase-money mortgage. Thus the share apportioned to income account in the junior share of the purchase-money mortgage is found to be \$757.93.

It was shown above that the total proceeds realized from the sale of the improved parcel consisted of $3,000 in cash and a purchase-money mortgage of $7,500. The cash was returned to principal account. The $7,500 purchase-money mortgage thereafter stood as security for unrefunded principal advances of $941.66 (it will be remembered that total principal advances were $3,941.66), the sum of $5,793.10, representing that portion of the original mortgage principal which was locked up in the improved parcel, and, finally, the sum of $756.96, the amount of the accrued income credit. The purchase-money mortgage accordingly secured a total of $7,491.72. It might be argued, therefore, that a " profit " of $8.28 was realized on the transaction. Believing in the relevancy of this conception, the accounting parties, on pages 8 and 9 of their account, have undertaken to find and to allocate a profit on their combined resale transactions. The term " profit " is inapplicable to these salvage proceedings. In the *Chapal* and *Otis* cases the Court of Appeals has stated that these mortgage salvage operations are *sui generis*. That court has set forth a rule of apportionment which makes inadmissible any concept of " profit " in relation to salvage transactions. It may be that in some rare case the eventual realization upon the salvage proceeds will equal or exceed the capital and the interest invested. If so, that excess (not a " profit ") is apportioned just as all other proceeds of the salvage are apportioned. The apportionment is made as of the date of sale. To that apportionment is attached all risks of loss and all hopes of gain. Whichever is the actual result, the respective accounts will lose or will gain. In no sense — certainly in no business sense — can a " profit " be assumed to exist because in a salvage operation the paper securities received have a nominal value in excess of the amount invested both for principal and income account. The same rule should be applied even if the unbelievable should happen and actual cash be paid on the resale in excess of the principal and income investments. Such surplus would not go all to principal, as might possibly be argued. It is the product of the carrying of the salvaged property until the resale, and to that carrying there have been contributions by the income account. Income account should have its apportioned share even though it has also had, after long delay, the full interest on the original mortgage principal. As was said in the *Chapal* case: " In such an investment situation what is involved is the salvage of a security. The security it is to be remembered is a security not for principal alone but for income as well. On a sale, therefore, the proceeds should be used first to pay the expenses of the sale and the foreclosure costs and next to reimburse the capital account for any advances of capital

for carrying charges not theretofore reimbursed out of income from the property. Then the balance is to be apportioned between principal and income in the proportion fixed by the respective amounts thereof represented by the net sale proceeds. In the capital account will be the original mortgage investment. In the income account will be unpaid interest accrued to the date of sale upon the original capital. The ratio established by these respective totals determines the respective interests in the net proceeds of a sale."

In the period intervening between the sale of the improved parcel on February 14, 1919, and the sales of the unimproved parcels which were completed in November and December, 1919, there accrued interest on the purchase-money mortgage of $7,500 given on the sale of the improved parcel. That interest was paid over to the income beneficiary. The court approves and confirms that payment. It constituted income on the salvage proceeds and was properly credited to income account. It does not enter into the computations of the share of the income account in the proceeds of the sale of the unimproved parcels. Neither is it permissible to use the interest on the $7,500 purchase-money mortgage to further reduce the unrefunded advances out of principal account in connection with the improved parcel. While such application might be attacked as an unlawful accumulation of income, an attack on that ground could probably be answered by the statement that it was a mere incident to the salvage operation and so was not violative of the statute. But a more pertinent reason exists for not so using the income from the purchase-money mortgage. The purpose of the salvage is to re-establish the assets of the estate on an earning basis. "Why should the life tenant fast * * * that the remaindermen may feast." (*Matter of Rogers*, 22 App. Div. 428, 436.) Whatever risk inheres in the purchase-money mortgage it is a risk which the life tenant proportionately is bearing by reason of the income account's participation in the mortgage. Whatever is produced in the way of interest on the purchase-money mortgage is true income of the trust. It is produced on an asset of the trust, and so belongs to the life tenant.

The next step in this salvage operation was the sale of the unimproved parcels. These sales have been dealt with as constituting a single operation. Since they occurred at substantially the same time and since the sales were made to the same man the court will deal with the proceeds as if there were only a single sale of the unimproved parcels. On this basis those parcels produced $11,250. In connection with the sale only $1,150 in cash was realized. During

the interval between acquisition of these unimproved parcels in foreclosure and resale in December, 1919, the cash outlays for taxes, for assessments, for foreclosure expenses, for refill of the lots after the sea damage and for sales expenses amounted to $3,326.20. Necessarily all the cash received must be put into principal account. There is left unrefunded of new cash invested $2,176.20. As was done in the case of the improved parcel principal account must be assigned a prior participation in the mortgage on the unimproved parcels in an amount equal to the unrefunded balance of new cash.

As a part of the deal whereby the unimproved parcels were sold, the $7,500 purchase-money mortgage on the improved parcel was satisfied, and in lieu thereof there was executed a new mortgage of $10,000. The effect of this was to secure by the improved parcel $2,500 of the purchase price of the unimproved parcels. The remainder of the purchase price of the unimproved parcels was represented by a purchase-money mortgage of $4,500 on one of them and a further purchase-money mortgage of $3,100 on the other. This transaction with the $7,500 purchase-money mortgage could not invalidate the claim of principal account to a prior interest in the $7,500 purchase-money mortgage. Such prior interest was by the act of the trustees transferred to and became a prior interest in the new mortgage of $10,000 placed on the improved parcel. So, too, the satisfaction of the $7,500 purchase-money mortgage and its substitution by the $10,000 mortgage could not abolish the respective shares in the junior portion of the $7,500 purchase-money mortgage which had theretofore been apportioned to income account and to principal account respectively. These shares in turn were transferred to the $10,000 new mortgage, so that in the first $7,500 of the new mortgage the senior and the junior interests stood exactly as they had in the original purchase-money mortgage of $7,500. The balance of $2,500 in the $10,000 purchase-money mortgage must be deemed junior in interest to the shares in that mortgage, which were substituted for the shares theretofore held in the $7,500 mortgage. In computing the apportioned shares of income and principal account in the proceeds of the sale of the unimproved parcels the $2,500 addition to the mortgage on the improved parcel is to be treated as if it were a part of the mortgages given on the unimproved parcels. In other words, the mortgage in respect of which apportionment is to be made is to be deemed a mortgage in the aggregate of $2,500, $4,500 and $3,100, or $10,100; a figure necessary to know in order that the net amount of the purchase-money mortgage taken on the sale of the unimproved parcels and available for apportionment may be ascertained.

Because of the unusual manner of liquidating the unimproved parcels the unrefunded balance of principal entitled to priority in payment must be assigned as a prior participation in the mortgages for $4,500 and $3,100. Priority could not be given to such funds in respect of the $2,500 which was loaded on the mortgage on the improved parcel, and so an application of " considerations of business policy," pursuant to the *Otis* rule, requires that the unrefunded principal advances be secured by the best security available, to wit, a prior participation in the mortgages on the unimproved land. Since transactions occurring in 1931 and hereafter adverted to make unnecessary the computation of the exact sums measuring the respective preferred participations by principal account in these two mortgages of $4,500 and $3,100, no exact figures will be set down. The principle for such allocation is stated, however, since occasion may arise when allocation must, in fact, be definitely made in an analogous case.

 Reverting now to the principal invested in the unimproved parcels, we find that of the original mortgage investment of $12,000, $6,206.90 is deemed to be secured by the unimproved parcels collectively. On that sum of money interest is to be computed at six per cent (the mortgage rate) from December 12, 1916, to November 14, 1919. As of this latter date the sale of the lots was closed and the purchase-money mortgages delivered though part of the consideration was not paid until November twenty-fourth and a small balance not paid until December 24, 1919. The manner in which the mortgages were adjusted as of November 14, 1919, confirms the propriety of dealing with the sale of the unimproved parcels as a single transaction. This period, during which the principal tied up in the unimproved parcels had earned no interest for the income beneficiary, was two years, eleven months and two days. The assumed interest credited on the basis of a principal sum of $6,206.90 is, therefore, $1,086.78. The $2,500 share in the new mortgage on the improved parcel and the two mortgages on the unimproved parcels (aggregating $10,100, as before stated) represent, therefore, an unrefunded principal advance for account of the unimproved parcels amounting to $2,176.20, the principal share in the original $12,000 mortgage amounting to $6,206.90 and the accrued and unpaid interest thereon since December 12, 1916, amounting to $1,086.78. The same formula is to be pursued. In the first mortgages on the unimproved parcels there is to be given a prior participation to principal account in the sum of $2,176.20. The remainder is to be apportioned, using for principal account the sum of $6,206.90 and for income account the sum of $1,086.78. The denominator of the fraction to be used is the sum

of the two figures last stated, or $7,293.68. The numerator for income account is $1,086.78. The numerator for principal account is $6,206.90.

The salvage operation having been completed, at least *pro tem*, by the sale of the unimproved parcels, the trustees rightly paid to the income beneficiary all of the interest accruing on the then three outstanding purchase-money mortgages. This practice continued for some twelve years until 1931. In that year a consolidation and extension agreement was entered into between the trustees and the mortgagor who had executed the respective purchase-money bonds and mortgages. The effect of this consolidation agreement was to make all of the mortgages liens upon all three parcels for the aggregate principal sum of $17,600. The agreement provided for interim payments on account of the consolidated principal. Such payments were made to the extent of $1,950, as provided by the agreement. As appears from page 19 of the account, all of these payments on account of the principal of the mortgages as so consolidated were credited to principal account. This was correct practice. When so credited to principal account they should also have been credited in reduction of the prior participation which, as hereinabove stated, should properly have been given to principal account in each of the three mortgages which were so consolidated.

It is desirable that comment should be made upon the nature of the rights granted to income and to principal accounts respectively in these salvage proceeds. For the sake of clarity of understanding the court has been speaking of " prior participations," " apportionment to income " and " apportionment to principal." These terms represent fictions just as do the expressions " origina mortgage principal " and " interest at the mortgage rate," referred to in the *Otis* opinion. The *res, i. e.,* the salvage proceeds, is at all times owned wholly and exclusively by the fiduciary. There is no tangible property interest in the *res* as such inuring to the income beneficiary or to the remainderman. What each of these persons has is only the right (exercised in an accounting or other appropriate proceeding) to have the fiduciary properly allocate the money or property in his hands. That right in an appropriate case may be assignable, but it does not rise to the status of a title to the *res* or to any portion of it. That title is in the fiduciary with all the attendant rights of management. And so it was wholly within the competence of the trustees to make the consolidation and extension agreement of 1931. They did not need the assent thereto of the income beneficiary nor of the remaindermen. There was no divided ownership of these three purchase-money mortgages.

Each of them was wholly and exclusively owned by the trustees. If, in dealing with the securities so owned, the trustees had failed to preserve and protect the respective interests of the income beneficiary and of the remaindermen, the trustees could be called to account. But not until such account and until a distribution directed by the court could any interest of either income beneficiary or remaindermen rise to the level of a property right in the *res*. The courts are here dealing with a situation which is *sui generis*. As was said in the *Otis* case, any rule applicable to the situations arising in the salvage operations " must in the end be shaped by considerations of business policy." Such considerations forbid the vesting in an income beneficiary of an interest in a mortgage in default or in a parcel of real property taken over in a salvage operation which would give to the income beneficiary either a right of foreclosure (Civ. Prac. Act, § 1079-a) or a right to institute a partition action (Civ. Prac. Act, § 1017).

In the exercise of their unqualified right to deal with the *res* which they owned, the trustees might validly consolidate and extend the mortgages as has heretofore been stated. In so doing they were, however, obliged to protect and preserve the priority of interest which principal account had been entitled to in respect of each of the separate mortgages. In the consolidated mortgage, therefore, from and after the date of the extension agreement there was a " prior participation " in favor of principal account in the sum of $3,117.86, which is the aggregate of the " prior participations " in the separate mortgages. It is against this aggregate sum that the payments of principal on the consolidated mortgage are to be credited, thus leaving unrefunded of new advances out of principal account a balance of $1,167.86. The consolidation had as well the effect of consolidating the " apportionment to income " and the " apportionment to principal " accounts in the junior shares of the respective mortgages so that the consolidated mortgage income account had apportioned to it a total of $1,938.62 and principal account (as a junior participation) had a total of $12,543.52. While this consolidation effected by the trustees in 1931 may be said to render unnecessary much of the detailed statements of principal and income participations in individual mortgages, yet such statement is valuable as evidencing the court's view of the applicable principles.

In the year 1934 the trustees, in lieu of foreclosure, paid to the mortgagor the sum of $500 and reacquired title to the real property. The consolidated mortgage was in default. Taxes and interest had remained unpaid, and the trustees had the right to foreclose had they desired. No criticism is made in the objections of the

method of acquisition or the cost of it, and so that is no longer open to question. What is involved in that reacquisition, of course, is a secondary salvage operation. That secondary operation opens up new problems of adjustment between principal and income account. In the reacquisition $500 of new capital was used. In the holding of the property new capital advances have been or must be made for taxes, for rehabilitation, for insurance and for like charges. Such new advances are to be dealt with under the *Chapal-Otis* rule. The trustees have dealt erroneously with the item of outgo and income in relation to the property since it was acquired by deed dated May 18, 1934. The items of outgo are found on a number of pages in the account, among which are pages 20, 58, 59, 88, 91, 92 and 125. The items of income are found on pages 58, 91 and 124. The trustees have dealt with the charge for acquiring the deed and for all the expenses of reacquisition as an addition to capital invested in the land. They have dealt inconsistently with the remainder of items of outgo. Sone of them, consisting of taxes and Sea Gate dues, they have charged to principal account. Others, consisting also of taxes and Sea Gate dues in part, they have charged to income account. It is unnecessary to discuss the items in detail since the general principles set down in *Matter of Chapal* will require a restatement of the account. It suffices to say that the gross outlays amounted to $2,901.61 and the gross income amounted to $2,518.44. The trustees were engaged from and after the acquisition of the deed in May, 1934, in a secondary salvage operation. They were obliged to take *all the costs* of carrying the property *out of capital* account. They were required to *put back into capital* account *all of the income* received from the property until at least capital was reimbursed. Since the income was less than the outlay the trustees were required to put all the money that they received back into principal instead of distributing any of it to the income beneficiary. Only after proper restatement of the transactions reported in the account and after further receipts of income shall produce an excess in the hands of the trustees over the amount advanced out of principal account will there arise any right in the trustees to exercise any discretion in favor of the income beneficiary. That point had not been reached in the account now in process of settlement.

The account here being settled is that of the deceased trustees. As to them all that is possible is to correct the errors in their management of the property. The reimbursement to principal account of money improperly paid out to the income beneficiary will still leave an unrefunded balance of new funds taken out of principal account in the course of the secondary salvage operation. That

unrefunded balance will be treated in the settlement of this account as a principal item which the successor trustees must eventually collect in the salvage operation.

While this account is solely one by the representatives of the deceased trustees, and though the decree will be limited in its effect to a settlement of such account, it seems appropriate to point out to the successor trustees who are parties to this proceeding the course of conduct which they should follow in dealing hereafter with the property which they now are managing. They start with an unrefunded principal advance made by their predecessors, and they will undoubtedly be called on to make further advances out of principal for carrying charges and for expenses of sale before they will be able to dispose once more of the real estate. They must proceed on the basis that the real estate now in their hands constitutes security for the amount of new money advanced by their predecessors and by themselves since the deed was taken on May 18, 1934. They hold the land also as security for the still unrefunded principal advances which were made in the original salvage operation, and which amount to $1,167.86. They hold the land, too, for general account of principal and income subject to eventual apportionment of the sales proceeds when and if they effect a sale. While the successor trustees hold the land they may not pay over to income account any money until all capital advances from and after May 18, 1934, have been fully repaid to principal account. Since the successor trustees are now possessed of the land and are again in the process of a salvage operation, they also have the right and the obligation to put back to principal account out of any surplus rents the balance of $1,167.86 which still remained unrefunded to princ pal account at the time the deed was acquired on May 18, 1934. If the operations of the property by the successor trustees prior to a sale of the land shall not produce enough income to refund to principal account all of the new moneys advanced and the $1,167.86 of unrefunded balance of old advances as well, then whatever sum is still unrefunded constitutes a first charge on the sales proceeds. If prior to such sale the successor trustees should have fully repaid to principal account all of the new money advanced since May 18, 1934, and all of the $1,167.86 theretofore unrefunded, they will be authorized under the *Chapal* rule to determine in their discretion whether any surplus rents in their hands shall be paid to the life tenant. As was said in the *Chapal* case by the surrogate (161 Misc. 61, 76): " If the income of a particular parcel is more than sufficient to pay carrying charges, the trustees will be bound to exercise their own discretion and

judgment upon the question of distributing such surplus income entirely, or retaining the same or some part thereof to meet possible subsequent deficiencies."

Considerations of business convenience justify direction to the successor trustees to use the income from the real estate to repay to principal account the unrefunded balance of $1,167.86. The trustees are now operating a piece of real property instead of holding as heretofore a purchase-money mortgage. The salvage operation which had been completed *pro tem* by the holding of the purchase-money mortgage has been again resumed by the trustees, and the earnings from the property should now be devoted first to reimbursement of principal account. Up to this point in the operation of the mortgage and of the property there was no opportunity to get cash for this purpose. The freezing of the unrefunded balance of principal into the purchase-money mortgage as a prior interest therein was done because it was the only available thing to do. Now that the mortgage is replaced by the land the necessity for keeping frozen the balance of $1,167.86 has disappeared and the land should repay the amount of principal account if the income suffices for the purpose. Refunding of this sum had been held in abeyance after the cash on the first resale proved insufficient to repay it. The obligation to principal account was partly honored by the amortization payments. Now this obligation is to be discharged by payment from any surplus of income during the secondary salvage operation. Finally, if no overplus of rents exists for this purpose the repayment will be made from cash realized on the next resale; and if no such cash is forthcoming the unrefunded balance will be consolidated with any unrefunded new principal advances in the secondary salvage operation to constitute therewith a prior participation in any new purchase-money mortgage.

When and if the successor trustees sell the premises they will be subject to the operation of the *Chapal* and *Otis* rule. No special instructions as to disposition of proceeds seems necessary in view of those cases. In respect of the original trustees this opinion has stated that it was appropriate for them to have obtained an appraisal of the property at the time of their acquisition of it in 1918. The same commentary is applicable to the successor trustees in relation to the acquisition by them. They, of course, took over the property only as of the date of their appointment in 1937. If in their judgment the property may again be resold in parcels they should obtain valuations as of May 18, 1934, when the deed to the land was obtained by their predecessors. If there be extant separate assessments of the respective parcels for tax purposes, the trustees may accept such assessments as *prima facie* establishing the relative

values of the parcels which enter into the whole. The only purpose of such appraisal is to furnish the basis from which the computations will start in determining income and principal participation in the proceeds of the next sale. If the trustees are of the view that the premises should be and can be dealt with as a single parcel they need do nothing further about an appraisal. If they are of opinion that the tax assessments (assuming separate assessments of the parcels) do not properly measure the relative values of the parcels (and it is relative and not intrinsic values which are here important) they should obtain appraisals by competent persons. If the trustees deal with the property in parcels they should keep separate accounts in respect of each parcel so that the amount of new money advances entering into the salvage of the respective parcels may be readily ascertained.

On a resale of the realty, whether in a single transaction or in separate parcels, the mortgage principal upon which principal and income participations are to be figured will be $15,650, less $1,167.86 of unrefunded principal and less $1,938.62 the already apportioned income interest in the $15,650 of total mortgage principal. While it was entirely proper to give to income account the whole interest on the mortgage of $15,650 while interest was being paid and thereby to give to income account interest on its own participation and interest on the unrefunded principal advances of $1,167.86 which were frozen in the mortgage those considerations no longer apply when the mortgage has been substituted by the land and the salvage operation has again been resumed. Again, the life tenant must be held to have said to the remaindermen: " You put up all the money for the salvage, and I won't expect any interest on it." (*Matter of Otis*, at p. 113.) Patently income account should not be permitted to improve its position as against principal account by claiming a right to compound interest on the now unearning share which had been assigned to income. When the income share in the mortgage ceased to produce income that cessation did not operate to reduce the rights of the principal account. It was a hazard which income account had to take. The true principal upon which there had been a true loss to income account is only that junior principal interest in the $15,650 mortgage, which in the present case amounts to $12,543.52.

The fact that the items which will require reallocation are so numerous and appear in so many places in the account makes it necessary that the court direct the filing of a supplemental statement by the accounting parties showing the results of the salvage operation when conducted pursuant to the directions contained in this decision. That statement is to be filed within ten days

after the filing of this decision. The filing of that supplemental explanatory schedule will facilitate the computations which must enter into the decree. When the statement is filed a decree may be submitted, on notice of five days, settling the account in conformity with the rulings here made.