In the Matter of the Accounting of President and Directors of The Manhattan Company et al., as Successor Trustees under the Will of Herman Joveshof, Deceased.

Surrogate's Court, Bronx County, January 17, 1951.

*Joseph J. Kozinn* for Arthur Jovis, individually and as successor trustee under the will of Herman Joveshof, deceased, and another.

*Robert E. Samuels* and *Charles Schwartz* for Carrie J. Weinstock and others.

*Edward E. Bianco,* special guardian for Helen A. Jovis and others, infants.

*Max Klein* and *Philip F. Solomon* for Mark Joveshof and another.

HENDERSON, S. In this proceeding to judicially settle the account of the successor trustees, a motion has been made to modify the Referee's report.

The principal issue raised by the motion presents a problem under section 17-c of the Personal Property Law.

On August 16, 1927, the prior trustees invested $108,000 in first mortgages on certain parcels of real estate in Jackson Heights, New York City. Because of defaults in the mortgages the trustees acquired these parcels of property between the years 1932 and 1938. On February 1, 1941, they were sold by the successor trustees as one parcel. A purchase-money mortgage was taken in part payment of the purchase price. On December 1, 1943, the property was reacquired by the trustees by deed in lieu of foreclosure of the said purchase-money mortgage.

The problem presented raises two questions:

(a) Is the purchase-money mortgage received on February 1, 1941, an investment made after the enactment of section 17-c of the Personal Property Law by the trustees of these trusts, thus bringing it within the provisions of subdivision 1 of said section of the Personal Property Law, with the results that the mortgaged property acquired by the trustees in 1943 by conveyance in lieu of foreclosure, became a principal asset in lieu of said mortgage, that the life beneficiaries became entitled to the net income from such acquired real property from the date of its acquisition, and that no allocation or apportionment as between life tenants and remaindermen of the proceeds of the sale of the previously mortgaged property shall be required?

(b) If the purchase-money mortgage received on February 1, 1941, is not a new investment within subdivision 1 of section 17-c of the Personal Property Law, shall there be paid to the life beneficiaries during the second salvage operation net income up to 3% per annum upon the principal amount of the mortgage (including both principal and income shares therein) or shall there be so paid to the life beneficiaries net income up to 3% per annum upon only principal share in the purchase-money mortgage?

With reference to these questions, the court adopts as its opinion the following extract from the report of Charles Kaufmann, Esq., the learned Referee:

As to question "(a)" I hold that the purchase-money mortgage is not an investment within subdivision 1 of section 17-c of the Personal Property Law.

The last paragraph of subdivision 1 of section 17-c of the Personal Property Law is as follows: "The terms and rules of procedure of this subdivision shall apply only to the estates of persons dying after its enactment and to trusts created under a deed of trust or other instrument executed after its enactment and *to investments of mortgages hereafter made by a trustee of an existing trust whether testamentary or inter vivos.*" (Italics mine.)

Exhaustive research has failed to disclose any decision wherein has been considered the question whether a purchase-money mortgage received on the sale of real property is an "investment", or wherein has been considered the question whether a purchase-money mortgage received after the effective date of section 17-c of the Personal Property Law is within the italicized part of the above-quoted paragraph of subdivision 1 of said section of the Personal Property Law.

As to whether a purchase-money mortgage may be termed an investment was under consideration in *Matter of Crimmins* (159 Misc. 499). The special guardian in that case objected that the purchase-money mortgage received on the sale of the acquired property was not a proper investment for the trusts. Surrogate DELEHANTY overruled the objection, stating at pages 501–502:

" Here the trustees took over in foreclosure a one-story building and found themselves confronted with the necessity of protecting a building already substantially injured by vandalism. They were confronted with the need to invest substantial additional principal sums to rehabilitate the building or to find a purchaser who was willing to take it in its then condition. They pursued the latter course and the purchaser gave back a purchase-money mortgage for the entire purchase price and after taking possession rehabilitated the building and put it into good order and condition. It is now operating satisfactorily and the trustees are obtaining income on the purchase-money mortgage. The purchase-money mortgage no doubt exceeds the limit permissible to these trustees if they were making a new mortgage loan on the same property. The special guardian objects to the transaction on that ground. There is presented, therefore, the question whether the limits upon trustees in respect of new mortgage investments are applicable to the acts of trustees in disposing of property which they are forced to take over in the effort to protect an original mortgage investment lawfully made.

" The court holds that the special guardian's objection is unsound and that the restrictive rule respecting original investments is not applicable to this type of transaction. Here the trustees were dealing with a salvage operation. The operation was not complete until the original capital had been recouped as far as was possible. The trustees had on their hands a piece of real property. They were charged with the obligation of diligence, honesty and fidelity in disposing of it on the best terms which seemed at the time to be available. They were necessarily clothed with a business discretion as to the manner in which they would further carry their salvage operation. The foreclosure of the land so as to get possession of it was only part of the salvage operation. So, too, the putting in of new capital was part of the salvage operation. So, too, was the decision to operate or not to operate the property while awaiting a purchaser. So, too, must necessarily be the determination when and on what terms to sell. No question could be made of illegality in taking title to the property. The taking back of a purchase-money mortgage is in effect a continued reservation of the title to the extent necessary to collect the balance of the purchase price. (*Boies* v. *Benham,* 127 N. Y. 620, 624; *Dusenbury* v. *Hulbert,* 59 id. 541.) "

The Legislature intended by " investments in mortgages " mortgage investments which complied with the restrictions imposed by law and statutes governing investments by trustees. It apparently did not intend to include purchase-money mortgages which, in most instances, exceed the limits and do not comply with the restrictive rules respecting trustee original investments for I believe it would have expressed its intent more clearly had it so intended.

Furthermore, clause (c) in the first paragraph of subdivision 2 of section 17-c of the Personal Property Law is applicable to real property acquired by foreclosure of mortgage or in lieu of foreclosure *before or after* the date of the statute's enactment in trusts created or mortgage investments made prior thereto. These parcels of property, as to the first acquisition thereof, were acquired by foreclosure or in lieu of foreclosure *before,* and as to the second acquisition thereof *after,* the date of the statute's enactment, and the trust herein were created prior to the statute's enactment and the mortgage investments also were made prior thereto.

Accordingly, the purchase-money mortage received on February 1, 1941, within the purview of subdivision 2 of section 17-c of the Personal Property Law.

As to question " (b) ":

The first salvage operation was terminated.on February 1, 1941, by the sale of the property, the trustees receiving the purchase-money mortgage as part payment of the sale price. To all intents and purposes the first salvage operation was concluded. As a result of defaults in the purchase-money mortgage, the trustees reacquired the property in 1943, and thereupon there was required a second salvage operation from the date (December, 1943) of such reacquisition of the property. That second salvage operation is still pending.

Paragraph (a) of subdivision 2 of section 17-c of the Personal Property Law prescribes in part as follows: " (a) Net income during the salvage operation up to three per centum ⁰ ⁰ ⁰ upon the principal amount of the mortgage shall be paid to the life tenant, regardless of principal advances for the expenses of foreclosure or of conveyance in lieu of foreclosure and arrears of taxes and other liens which occurred prior to such foreclosure or conveyance and the cost of all capital improvements."

Section 17-c of the Personal Property Law became effective on April 13, 1940. The second salvage operation, still uncompleted, is governed by that legislation.

Both " principal " and " income " had " participations " in the purchase-money mortgage at the inception of the second salvage operation.

The answer to this question " (b) " involves the meaning of the words " the principal amount of the mortgage " appearing in the above-quoted excerpt from the Personal Property Law.

The Legislature did not provide in *haec verba* for the situation in which there might be two or more salvage operations arising out of more than one acquisition of the property due to defaults in purchase-money mortgages accepted as part payments on sales terminating prior salvage operations. It may be assumed, however, that at the time of enactment of the statute (Personal Property Law, § 17-c), the Legislature was conversant with decisions theretofore rendered which had considered and ruled upon salvage operations. *Matter of Martin* (165 Misc. 597) decided in 1937, was such a decision. In that case, the real estate was reacquired on default in the purchase-money mortgage received on the sale which terminated a first salvage operation, and thereupon a second salvage operation was required. Surrogate DELEHANTY (pp. 606, 609, 614) said it was proper to give to income account, while interest was being paid, the whole interest on the purchase-money mortgage. (See, also, *Matter of West*, 175 Misc. 1044, 1062, and 3 Warren's Heaton on Surrogates' Courts, § 319, p. 976.6.) He also stated (p. 614) that the considerations which warranted such payment of interest to income account no longer applied " when the mortgage [was] substituted by the land " and a salvage operation again became necessary.

The life beneficiaries not being entitled to interest on the purchase-money mortgage since the mortgage became " substituted by the land ", every consideration of equity and the spirit which prompted the enactment of section 17-c of the Personal Property Law in the interest of life beneficiaries impels me to determine that the base for the computation of the 3% per annum payable to the life beneficiaries is no less than the entire principal sum of the purchase-money mortgage replaced by the land, in this instance, the purchase-money mortgage accepted by the trustees in 1941. I do not agree with any contention which would limit such base to only that portion of the purchase-money mortage allocated to " principal ".

Despite an hitherto unchartered course, both principle and authority require the conclusion that, during the pending salvage operation, the life beneficiaries are not limited to 3% per annum on only principal participation in the mortgage. That is required also because of the very explicit purpose for the enactment of section 17-c of the Personal Property Law as expressed in paragraph (d) of subdivision 2 of said section of said law and in the note of the commission appended to said section.

In *Chase Nat. Bank* v. *Guardian Realties Inc.* (283 N. Y. 350) the court said at page 361: "It is a familiar canon of interpretation that the several parts of a statute are to be read together in ascertaining the legislative intent and, further, that remedial legislation designed to correct a condition must be construed in the light of the circumstances and the law theretofore existing. (*City Bank Farmers Trust Co.* v. *Ardlea Incorporation*, 267 N. Y. 224.) "

By applying and following that rule, the determination of this question is quite clear.

It can serve no useful purpose to repeat *in extenso* the characteristically clear and incisive observations of the late Surrogate FOLEY in *Matter of West* (175 Misc. 1044, *supra*) wherein he presented his well-considered reasons for concluding that that legislation was constitutional (in which he was upheld by all the reviewing courts, including the United States Supreme Court [affd. 264 App. Div. 701, affd. 289 N. Y. 423, affd. 321 U. S. 36]). Suffice it to say that that statute was designed to rectify a mischief and the learned jurist was determined "so to construe the act as to suppress the mischief and advance the remedy" (p. 1051). A mischief cannot be "cured" by weaving fine reasons for not applying the statute having that salutary purpose in mind.

We must bear in mind that *Matter of Otis* (276 N. Y. 101, 112) had declared "both capital account and income account, as described in the *Chapal* case, are fictions", that the difficulties of a certain course suggested "would be too many" and that "indulgence in both fictions keeps the balance even between the respective parties in interest."

Judge LOUGHRAN also said (*Matter of Otis, supra*, p. 115): "Perhaps it should be added that a general rule for such situations cannot be attained at a bound, that no rule can be final for all cases and that any rule must in the end be shaped by considerations of business policy. Accordingly, we have here put aside inadequate legal analogies in the endeavor to express fair, convenient, practical guides that will be largely automatic in their application. Only the sure result of time will tell how far we have succeeded."

These intimations were repeated and applied by Surrogate DELEHANTY in *Matter of Martin* (165 Misc. 597, 601, 602, 604, 609, 610, *supra*). And Surrogate FOLEY commented that "the 'sure result of time' had led the Legislature to make the changes of procedure [section 17-c of the Personal Property Law] upon the ground of necessity and advisability by the enactment of the new subdivision" (*Matter of West, supra*, p. 1051). *Matter of Martin* (*supra*, 601) alluded to the court's endeavor "to shape a rule by considerations of business policy and to arrive at a basis which is fair, convenient and practical."

The "participations" of principal *and* income are "fictions" (*Matter of Otis, supra*, 112), not actualities. They are "rules of procedure" (*Matter of West, supra*, pp. 1050-1051), not "property" rights. They were formulated by setting aside "inadequate legal analogies", and by resort to equitable principles and "considerations of business policy" to attain "fair, convenient and practical guides" for the disposition of these questions (*Matter of Otis, supra*, p. 115). They have been adopted, not because they were believed to be

sound for all time, but in the hope rather that the "sure result of time" would evolve doctrines which might be accepted as the fairest and most equitable in the solution of this confused and involved problem. This statute is now the legislative expression of those rules of procedure seemingly best adapted, as a result of the passage of time, to the fictions which were at best proposals but were never intended to be vested property rights (*Matter of West, supra,* p. 1051).

As this legislation has been held constitutional, it is not in any aspect a "taking" of "property"; it is at most purely and simply a revision — perhaps a codification — of "rules of procedure" in the disposition of salvage proceeds, resulting in the fairest and most equitable practice which courts and Legislature could formulate for a fund not suitably distributable by the application of established legal analogies.

Being merely "rules", then as Surrogate FOLEY so aptly said in the *West* case (*supra,* pp. 1050–1051) : " The Legislature has done no more in formulating a modification of existing rules than the courts themselves could do and have done within their constitutional powers. In a general sense the rules as to these salvage operations have been in a fluid state and have never been absolutely or finally fixed by the courts in their application to existing trusts or prior salvage operations."

I therefore conclude, — and this is likewise my response to question " (b) " — that the life beneficiaries shall be paid during the second salvage operations up to 3% per annum upon the principal amount of the purchase money mortgage (including both the so-called "principal" and "income" shares therein).

The Referee is also correct in his holding that the decree entered on June 26, 1937, judicially settling the account of the trustees while the salvage operation as to certain real property in Bronx County was pending is not *res judicata* as to the formula for the apportionment of the salvage proceeds (*Matter of Crimmins,* 159 Misc. 499).

However, in view of the lack of any objection to the method employed by the trustees and by reason of the fact that to obtain the data for the period prior to the 1937 decree with respect to each of the foreclosed properties, if at all obtainable, would be extremely costly both as to time and money, the court will approve the method of apportionment set forth in the schedules of the account.

The report of the Referee except as to this modification is confirmed in all respects.

Settle order and proceed accordingly.